**R. T. DABBS, Plaintiff,**

v.

**INTERNATIONAL MINERALS & CHEMICAL CORPORATION, Defendant.**

**No. EC 7076.**

United States District Court,
N. D. Mississippi, E. D.

Feb. 24, 1972.

Thomas J. Tubb, West Point, Miss., for plaintiff.

Robert D. Patterson, Aberdeen, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Invoking diversity jurisdiction, R. T. Dabbs (Dabbs), a Mississippi citizen, brings this suit against International Minerals and Chemical Corporation (IMC), a New York citizen, for a declaration to determine his rights as as-

signee of a mineral royalty contract executed on November 29, 1955, between Needham W. Dahlem (Dahlem), Dabbs' assignor, and IMC.[1] By that contract IMC agreed to pay Dahlem (or his assignee) a royalty of 5¢ per ton on all bentonite which IMC mined on certain described lands in Monroe County, Mississippi, the stated consideration for payment of the royalty being Dahlem's disclosure to IMC of the location of bentonite deposits "known only to him."[2] Attached as a rider to the contract is a legal description of the subject land comprising a contiguous body of about 1000 acres situated about 5 miles south of Aberdeen (yellow area).[3]

By its answer IMC interposed several defenses which rest upon the assertion that IMC executed the contract at Dahlem's insistence before the rider containing land description was inserted by Dahlem, and it claims the contract was invalid for the following reasons: (i) the existence of bentonite deposits on the described lands was already known to IMC through prior geological explorations and studies and hence there was a failure of consideration as Dahlem did not disclose to IMC any bentonite deposit, the existence of which was known only to him; (ii) when IMC first saw the land description tendered by Dahlem it repudiated the contract and disavowed any intention to be bound thereby; (iii) Dahlem fraudulently induced IMC to sign the contract upon representations that the secret bentonite deposits were near IMC's plant at Smithville and within an economically feasible distance from that plant, although Dahlem knew that his alleged secret bentonite discovery was in an entirely different area of Monroe County and located south of Aberdeen, and was of a quality of bentonite different from that in which IMC was interested; and (iv) Dahlem and Dabbs are estopped on account of Dahlem's actions in obtaining IMC's signature to the contract in the first instance and barred by laches because of inaction after disavowal of the contract.

The parties have agreed to submit for decision the basic issue of liability, reserving for future hearing an accounting in event the plaintiff might prevail. After the entry of a pretrial order, the court conducted an extensive evidentiary hearing. The case is now ripe for decision and this Memorandum Opinion shall suffice for findings of fact and conclusions of law required by Rule 52 of F. R.Civ.P.

## I.

### (a) *General Background.*

Bentonite is a clay-like mineral resource formed by decomposed volcanic

---

1. Dabbs on April 4, 1962, purchased from Dahlem an undivided one-half interest in the royalty contract. Dahlem died intestate on May 3, 1962, and on June 20, 1964, Dabbs acquired the remaining one-half from Dahlem's heirs at law.

2. The contract provides in relevant part:
   "WHEREAS, the Party of the First Part [Dahlem] has located certain deposits of Bentonite, the existance [sic] of which is known only to said Party.
   AND WHEREAS, the Party of the Second Part [IMC] is in the business of purchasing and mining Bentonite and is interested in learning the location of such Bentonite deposit with the view of purchasing or leasing same for mining purposes.
   NOW THEREFORE, it is agreed that the Party of the First Part will show to the Agents of the Party of the Second Part, the above mentioned deposit of Bentonite and the Party of the Second Part agrees that if it is successful in purchasing or leasing said deposit, it will pay to the said Party of the First Part as a royalty, for his services in discovering said deposit, the sum of $.05 per ton for each ton of Bentonite mined by the Party of the Second Part from such deposit. It is further agreed that said deposit is located in Monroe County, Mississippi. . . ."

3. The subject lands, referred to in the evidence as the lands shaded in yellow, or "yellow area", embrace the South Half of Section 14, the East Half of the East Half of the Northeast Quarter of Section 22, all of Section 23 except the South Half of the Southeast Quarter, and the Northwest Quarter of Section 24, in Township 15 South, Range 7 East. Ex. 138 omitted from the published opinion.

ash which settled in rivers and stream beds in prehistoric times. Bentonitic clay expands when wet and can withstand great heat, and these properties make it usable in the foundry industry and in other industrial operations. Bentonite usually occurs in small pockets or pods similar to deposits of oil. In Monroe County bentonite deposits have been found in several localities and these occurrences are spotty and noncontinuous. The most prominent types of bentonite in Monroe County are "Smithville" found in the northeastern portion of the county and in the southeastern portion of adjoining Itawamba County, and "Tombigbee" present in the "Panther Creek" and "Little Panther Creek" areas. The Smithville clay is a non-marine variety found in a geological strata known as the McShan formation, while the Tombigbee clay is a marine deposit found in the Tombigbee sand of the Eutaw formation.

Although the mineral itself was apparently known by other names as early as 1905, it was not until about 1915 that it was described in geological publications and it did not come on the American market in quantity until 1919. Bentonite derives its name from large deposits of the material first discovered in the United States near Fort Benton, Wyoming, in 1888.

A resident of Monroe County, Dahlem was a farmer, trapper, and woodsman, as well as a self-educated geologist. He is generally credited with the discovery in 1927 of the first bentonite deposit in Mississippi. This discovery was made on lands that he owned south of Aberdeen. His property, an extremely rugged and heavily wooded area, was traversed by the Panther and Little Panther Creeks, which cut deep ravines in their flow to the Tombigbee River. It is a generally accepted fact that Dahlem discovered bentonite when he trapped a mink in an outcropping of the material in Panther Creek and sent a sample of the strange clay taken from the furry animal to the Mississippi and the United States Geological Surveys. His sample was confirmed to be bentonite of excellent quality. The published literature on Mississippi geology affirms the foregoing to be an established fact.[3a]

Despite Dahlem's discovery, his first efforts to arouse interest in the new material were unsuccessful. In the early 1930's however, he induced Perel and Lowenstein (P & L), owners of a laundry in Memphis, Tennessee, to develop the mineral deposit he had earlier located. P & L purchased 320 acres just east of Dahlem's own property and began an exploratory program. P & L employed Dr. Poole Maynard, a New York geologist, to make a detailed study of the bentonite discovery, and Dahlem learned the methods of geological exploration for bentonite by working with Maynard. These investigations included digging wells and shafts for drilling numerous holes with hand augers, none exceeding 35 feet, and taking samples for laboratory analysis. Maynard conducted these tests on property south and east of the yellow area, or lands in controversy; and his geological studies culminated in a report dated March 18, 1935, and known as the Poole Maynard Report.

Until his death in 1962, Dahlem continued to be very active in exploring for bentonite deposits. He closely followed the work of different geologists who studied the area, and gradually acquired a good working knowledge of the material, which is not easily detectible. When found in outcroppings and exposed to the weather, bentonite has a creamish color, but when taken from deposits beneath soil overburden, it has a dark or bluish hue. Having an intimate familiarity with the rugged terrain, Dahlem conducted independent explorations for bentonite by various methods. He searched for and examined outcrops or areas of exposed bentonite, drilled holes with a hand auger, dug deep shafts

3a. Without doubt, bentonite is a "mineral". Cole v. McDonald, 236 Miss. 168, 109 So.2d 628 (1959) (a Monroe County case).

in the ground and entered the holes by ladder. Later he followed and closely observed oil drilling and seismographic crews operating in the county to ascertain if bentonite strata had been encountered, and at what depth, on various lands in the search for oil and gas. Although in the 1930–40 era the industry considered 30 feet the allowable maximum soil overburden for commercially feasible mining for bentonite, Dahlem drilled and dug holes of 100 feet maximum depth prospecting for underground deposits.

In 1939 the first processing plant for bentonite was established in Monroe County; it was built by Dahlem and C. C. Ruprecht. Shortly thereafter this plant was purchased by the American Colloid Company, which subsequently moved its plant operation to or near Aberdeen.

Also in 1939 Eastern Clay Products (ECP), the predecessor of IMC, entered Mississippi to mine bentonite and, after a general survey, established its plant in Pontotoc County. In 1944 bentonite reserves in the Pontotoc area became exhausted and ECP moved its plant to Smithville, in north Monroe County, where it began active mining operations and continued its exploration program for new bentonite reserves. This exploration program was still in progress when IMC in 1951 acquired ECP. IMC at once entered into active competition with other national companies which were engaged in mining and marketing Mississippi bentonite. Filtrol Corporation had a plant near Smithville, and American Colloid Company had its plant just south of Aberdeen.

ECP's explorations from the inception were directed by Norman J. Dunbeck, the company official responsible for locating the plant at Pontotoc and relocating it at Smithville. Dunbeck employed E. D. Phillips, a self-trained prospector, to hunt new reserves, or "wildcat" for bentonite deposits over a large territory, including Monroe, Itawamba, Pontotoc and Tishomingo Counties in Mississippi, as well as portions of Alabama and south Mississippi. Phillips' job, described as "birddogging", was to be active throughout the area, check all rumors, watch competitors and other prospectors including Dahlem and keep Dunbeck regularly advised. Phillips made many "horseback" guesses on bentonite locations, but seldom did detail work on any particular property. His reports, consisting of a volume of letters written over a long span of time, were not limited to bentonite, but included activities on oil, bauxite, aluminum and other minerals. Phillips worked off and on for IMC for a number of years and worked with a succession of geologists sent into the area by ECP. In 1942 Phillips was joined by Frederic Mellen, a geologist hired by ECP to conduct an exploratory program for bentonite. Mellen drilled holes at designated locations and recorded the data; this drilling program was conducted east of the yellow area. In 1952, Mellen made a comprehensive study of the P & L properties; he reviewed the Poole Maynard Report, and inspected the remaining reserves indicated by Maynard's map and by outcrops. While Mellen suggested that IMC might give serious consideration to exploring the subject lands and other lands, IMC did no drilling in the area south of Aberdeen from 1942 until 1955. As for the specific property in controversy, IMC made no effort to acquire ownership, options or other control over any portion of it until after the royalty contract was signed with Dahlem on November 29, 1955.

(b) *Events Leading to Execution of Royalty Contract.*

In 1954 IMC undertook to map a program for wildcat drilling for bentonite deposits on the basis of information submitted by two geologists in its employ, Dr. Frank Hunter and Roy Hall. Hall worked in the Monroe-Itawamba Counties area on a drilling program under the direction of Dr. Hunter, who maintained his offices at IMC's Chicago headquarters. Hall and Hunter collaborated to map all known occurrences of bentonite in the two-county area, from

which they proposed several localities for further prospecting. By the Hunter-Hall Report to IMC in December 1954, these prospect areas were designated in order of their priority as Areas I, II, III and IV respectively.[4] Areas I and II were situated near Smithville in northeastern Monroe County, Area III was in Itawamba County northwest of Smithville; and Area IV was south of Aberdeen and included a large area comprising approximately 23 square miles located in 30 different land sections. The "yellow area" description later disclosed by Dahlem comprised 2 square miles of the territory designated as Area IV by the Hunter-Hall Report. This report, however, indicated all known bentonite deposits in Area IV as reflected by a specially prepared map.[5] During the course of his work, Hall was contacted by Dahlem who informed him that he knew of secret bentonite deposits which he was willing to disclose to IMC for an agreed royalty, and the Hunter-Hall Report recommended the negotiation of such an agreement.[6]

In September 1955, Tracy Lusk, a Mississippi-located geologist, was hired by IMC to work under Dr. Hunter's supervision. Lusk's work was divided between development drilling of known deposits and wildcat drilling in areas geologically favorable for the occurrence of bentonite deposits. Using the Hunter-Hall data as a guide, Lusk conducted field investigations in different locations as directed by Hunter and sent samples of clay for analysis to IMC's Smithville plant, where C. M. Clay was superintendent. In mid-October, Hunter suggested that Lusk make reconnaissance of the general area around Aberdeen and contact Dahlem to determine if he would give out information. In his weekly report of November 7, Lusk advised he had contacted Dahlem, who was claiming to know of two secret deposits which he would disclose for a royalty consideration.[7]

4. Geologic Map of Monroe and Itawamba Counties, Ex. 4.

5. Bentonite occurrences known in 1954 nearest the yellow area were in the Northeast Quarter of Section 26, the North Half of Section 25, the East Half of Southwest Quarter and the Northeast Quarter of Section 24, and the South Half of the Southeast Quarter of Section 13, Township 15 South, Range 7 East. These areas are colored red on attached Ex. 138.

6. From the Hunter-Hall Report (Ex. 70, p. 25):
"NEEDHAM DAHLEM PROSPECTS Mr. Dahlem claims to have located three bentonite deposits which may contain commercial bentonite. He did not reveal any locations.
According to Mr. Dahlem, the largest deposit is within 30 to 40 miles of Aberdeen. Maximum bentonite thickness is not known but will be plus 3 feet thick. The area is rolling hills, well drained and the bentonite is well above water level. Overburden is 60 to 120 feet thick. He estimates 300 to 400 acres are underlain by bentonite.
He has no control of the property and will reveal locations only on some guarantee of remuneration, preferably a royalty payment. He mentioned 5¢ a ton. A

sample from the above prospect had a wet strength of 9.8 pounds compared to our standard of 8.8 pounds.
The sample he submitted is a gray silty bentonite similar to the material being mined South of Aberdeen. This and his general description of the topography suggest that the deposit may be in the Tombigbee member of the Eutaw formation. It may even be quite near Aberdeen."
Hall's final recommendation to IMC was: "Negotiate a contract with Mr. Needham Dahlem to get him to reveal the location of his large bentonite discovery. He will probably be receptive to any reasonable offer. However, he has no control of the property, which may complicate the matter." (Ibid, p. 4).

7. Lusk wrote (Ex. 29):
"Tuesday, Wednesday, and part of Friday spent examining prospects of a drilling program in Area IV south of Aberdeen. Talked with Needham Dahlem, but he would not disclose the location of either of the two deposits he claims to know. He is willing to show us, but not until he has a written contract giving him $0.05 a ton royalty . . . I don't think he will ever show the bentonite without compensation. He said that one of the deposits had an outcrop of six feet, and the other deposit had no outcrop."

During the week of November 14, C. P. Loucks, an IMC executive, in company with Hunter, Clay, and Lusk contacted Dahlem, who renewed his offer to disclose the two deposits for a consideration payable when and if IMC mined the property. Dahlem was unwilling to reveal the location of the deposits until a written contract was first signed by IMC. Agreeing to this procedure, Loucks instructed IMC's attorney to prepare the royalty agreement in suit, using Loucks' phraseology, but without land description; the agreement was signed in Chicago by IMC's officials on November 17, and executed by Dahlem in Monroe County on November 29, when he inserted the land description. At or about the same time Dahlem executed a second and similar agreement with IMC for disclosing bentonite deposits in Clay County, which was checked out and found to be not commercially feasible.[8] The Dahlem contract was delivered to Clay, who submitted it to the Chicago office. There was no written acceptance of the description by IMC officials. Since there exists a factual dispute as to IMC's position concerning the contract, this issue will be subsequently dealt with.

As established by the Lusk weekly reports, Dahlem then showed Lusk the location of various holes on the subject land,[9] which Dahlem claimed he had drilled and gave him clay samples for analysis. IMC took steps to acquire options wherever possible, and Lusk began at once drilling in the yellow area, starting with Delma Smith at the western extremity. There is no direct evidence from the named property owners that in 1955 they were aware of the existence of bentonite deposits on their lands; and Lusk and other IMC personnel closely guarded their drilling data. Lusk pursued a program of deep-hole drilling throughout the yellow area, and despite the thick overburden, was successful in locating large deposits of bentonite. At the end of several months' exploration he was able to determine that the bentonite bed in the Panther Creek area "is one very large bed about 3 miles long from north to south with the Perel & Lowenstein and Dahlem mine located near the center"; with the maximum thickness 10.5 feet and the maximum width of the bed about one mile located slightly north of the original P&L mine.[10] Lusk was able to estimate total reserves of 13 million tons in the Panther Creek area consisting of the original P&L and Dahlem lands, the lands in the yellow area and an adjoining quarter section (SW ¼ of § 13) known as the Worthy tract. Lusk's work with IMC was terminated in March 1956 and no further exploratory work was done by IMC on the subject area.

In January 1956 Dahlem told Dabbs, who was his friend, physician, and sometime business associate, about his royalty agreement for the secret deposits and agreed to sell him an interest for $5,000, which Dabbs paid in cash. Although the document was recorded on the public land records in December, 1957, presumably by Dahlem, Dabbs did not see the written contract until April 4, 1962, when he received from Dahlem the formal assignment of a one-half interest. In 1964 Dabbs acquired the remaining interest from Dahlem's estate for a con-

---

8. Lusk's weekly report of December 2 (Ex. 33):

"Monday, Tuesday and Thursday afternoons were spent in Aberdeen closing the agreement with Needham Dahlem concerning the deposits he has located. One deposit is between the pit on his place (Nash pit) and Aberdeen. The other deposit is in Clay County about two miles south of the Monroe County line in the Tombigbee sand. At the Clay County location, he showed us a 2.5 foot out crop of blue bentonite."

9. In 1955, the yellow area was owned by 7 different persons: B. S. Logan (166 acres), Delma Smith (40 acres), Richard Booth (80 acres), L. B. Cole (374 acres), H. C. Kilgo (80 acres), Justice Whitfield (150 acres), and Collie Dahlem (100 acres).

10. Lusk's summary report in March 1956, (Ex. 67, p. 15)

sideration of $500. In 1960 Dabbs, who also owned a tract of land south of the P&L mine of American Colloid Company, purchased a mineral interest (%₂₇ths) in the Cole property, which was within the confines of the yellow area, and offered it to IMC, in an effort to get the latter to commence bentonite mining.

In the years following, IMC obtained control of a substantial portion of the bentonite mineral interest in the yellow area. When the Smithville bentonite deposits became depleted, IMC in 1968 moved its plant to Aberdeen and soon thereafter commenced strip mining for bentonite on the Cole property, a part of the lands in controversy. The bentonite deposits in the Panther Creek area are rated as one of the largest bentonite formations in the South and presently regarded by geologists as a classic example of marine bentonite of large and continuous lateral extent. The industry has found the thick overburden of the Tombigbee bentonite in the Panther Creek area not to be an obstacle to commercially feasible mining, and the market price of processed bentonite in recent years has ranged from $15 to $22 per ton.

After IMC began to mine the Cole property, Dabbs called on the company to honor the royalty agreement; the company in July 1970 declined to recognize the agreement, and Dabbs on September 14, 1970, filed the present action in this court seeking declaratory judgment.

## II.

This case presents two distinct questions that require the making of factual determinations from disputed evidence. First, was IMC induced by misrepresentations on the part of Dahlem to enter the contract, thus rendering

it invalid because of fraud? Second, apart from fraud, was the contract void ab initio for want of consideration? Mississippi law must control in the application of legal principles since that jurisdiction was not only the situs of the consummation of the royalty agreement but the "center of gravity" in the contacts affecting all aspects of the entire transaction.[11] The parties agree that Mississippi law should apply.

### (a) *The Fraud Issue.*

IMC's claim of fraud is based upon the contention that Dahlem tricked it into signing the contract by representing that his secret deposit was located near IMC's Smithville plant, and that it was of the Smithville-type clay with little overburden, thus meeting IMC's known desire to mine additional deposits in the Smithville area to keep its established plant in operation. The assertion is that Dahlem misled defendant since the yellow area which he designated, and situated south of Aberdeen, was well beyond the Smithville region, and the Tombigbee bentonite found in that vicinity could not feasibly be processed at the Smithville plant.

It hardly requires citation of authority to affirm the familiar rule that fraud must be proved by clear and convincing evidence,[12] or by clear proof which is more convincing than a mere preponderance of evidence.[13] The difficulty of proving actual fraud does not obviate the necessity of doing so; and mere suspicion, insinuation or presumption is not sufficient.[14] IMC, as the party asserting the affirmative defense of fraud, must meet the requisite burden.

11. Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 188 So. 539 (Miss. 1939); Craig v. Columbus Compress & Warehouse Co., 210 So.2d 645 (Miss. 1968). See Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F.Supp. 1176 (N.D.Miss.1970).

12. Carter v. Eastman Gardner & Co., 95 Miss. 651, 48 So. 615 (1909); Metropolitan Life Ins. Co. v. Hall, 152 Miss. 413, 118 So. 826 (1928).

13. Martin v. Gill, 182 Miss. 810, 181 So. 849 (1938); Tupelo Spindle Co. v. Allis-Chalmers Mfg. Co., 339 F.2d 592 (5 Cir. 1964).

14. Willoughby v. Pope, 101 Miss. 808, 58 So. 705 (1912).

IMC's principal witnesses on this issue were C. P. Loucks, Maurice Clay and Dr. Hunter. Loucks, IMC's principal negotiator, testified that he was shocked to learn that IMC's reserves in the Smithville area were so low that they might be exhausted within 10 years and that Dahlem's claim was of interest because he was under the impression that Dahlem's deposit was within 8 to 10 miles of Smithville. This witness candidly acknowledged, however, that the secret deposit Dahlem had in mind might be located elsewhere than near Smithville. In his negotiation, Loucks endeavored to obtain from Dahlem a limitation of location as well as a designation of the kind of bentonite clay, but Dahlem was unwilling to make even limited disclosure. Dr. Hunter's testimony was even more revealing in that he stated that at the time of the contract IMC's interest in bentonite was widespread and did not have to relate to the Smithville area. The witness Clay, who tendered the strongest testimony on the fraud issue, stated that Dahlem many times had told him that his secret deposit was near Smithville, which information he had passed on to Loucks long before the latter made contact with Dahlem. Nevertheless, it is very significant that Loucks, when confronted with Dahlem's refusal to talk location or description until he had a signed contract, was the person who conveived the phraseology that was used in the royalty agreement. According to his testimony, Loucks' avowed purpose was to protect IMC in its promise to pay a royalty only upon receipt of information of value to defendant when Dahlem did make his disclosure. Yet, the written document drafted by IMC's attorneys under Loucks' directions and using his words contained no territorial limit as to where the deposit should be other than in Mississippi and had no reference to proximity to the Smithville plant, or to type of clay or extent of overburden.

Ordinarily, in contract construction, absent a claim of fraud, an instrument is construed against the party who drafts it, and that consideration is likewise pertinent here. Had these omitted matters been at all material to IMC's promise for payment of a royalty, it is incomprehensible that Loucks, an expert in mineral contract negotiations, would fail to insert protective clauses. Actually, the bargain intended to be made, and as made, was quite simple: when and if Dahlem showed IMC the secret deposit, IMC would pay him a royalty on bentonite which it mined therefrom, otherwise Dahlem would receive nothing.

IMC's evidence shows that Loucks and Hunter, long before the execution of the Dahlem contract, were quite aware of the recorded impressions of their geologist, Roy Hall; these impressions were based on overtures made to him by Dahlem in 1954 concerning the location and character of the secret deposit. Hall had reported to them in detail on what Dahlem had told him regarding the secret bentonite,[15] i. e., the largest deposit was "within 30 to 40 miles of Aberdeen", "maximum thickness not known but plus 3 feet thick", "area is in rolling hills", "overburden 60 to 120 feet", and "300 to 400 acres underlain by bentonite."[16] On the basis of Dahlem's clay samples, Hall had advised his superiors and Loucks that the bentonite deposit Dahlem had in mind "may be in the Tombigbee member of the Eutaw formation. It may even be quite near Aberdeen."

The court finds as a fact that Loucks came to Mississippi to negotiate the contract with Dahlem which his field geologists, Hall and Lusk, had previously recommended, and IMC's interest was not restricted merely to bentonite in the Smithville territory. Indeed, the evidence discloses that IMC officials, at or about the time of making the Dahlem royalty agreement, were contacting the owners of P&L tract in the hope of get-

---

15. Footnote 6.

16. The bentonite deposits which Dahlem showed Lusk on the yellow area lands had all of the stated characteristics.

ting control over the known deposits of bentonite on that property. While Area IV was of lowest priority in the 1955 exploratory program, IMC had a definite interest in knowing more about the geology of the area and had instructed Lusk to conduct perimeter drilling around the P&L property as a part of his field work. The recurrent interest IMC had in Tombigbee clay, prior to the Dahlem contract, is highly inconsistent with the notion that Dahlem's "finder's fee" had to be for locating Smithville clay near its plant established at Smithville, and not otherwise payable.

The court does not find credible the testimony of Clay, who stated that when Dahlem tendered him the signed contract with the land description attached, he told Dahlem that the described lands were not in the intended area, i. e., Smithville, and IMC would not accept the agreement. Lusk was present at that meeting, and he did not recall such conversation or that IMC appeared to be dissatisfied with the contract. Although Clay submitted the completed contract to his superiors at Chicago, they never wrote or otherwise notified Dahlem that the contract was repudiated because of his misrepresentation. On the contrary, the conduct of both Dahlem and IMC tends to indicate mutual recognition of a binding agreement. For Dahlem's part, he told other people that he had entered into the contract with IMC; he recorded the document and sold Dabbs, his trusted friend, an interest in his prospects for a substantial sum of money. For IMC's part, it is clear from the testimony and written reports of Lusk, who appeared as a witness for Dabbs, that the defendant proceeded to act upon the contract. Lusk testified without dispute that Dahlem was very cooperative and showed him different locations throughout the yellow area at which he had drilled deep holes and furnished him with samples of the clay. As stated, Lusk reported this information promptly to IMC. It was upon that basis that Hunter issued astute directions to Lusk for starting a drilling program on the yellow area, and the suggested program was explicitly carried out, to the advantage of IMC. It was only after Dahlem's disclosure that IMC made serious efforts to obtain leases from the landowners of the yellow area.

In disposing of the fraud issue, the court concludes that the testimony of Loucks and Hunter, many documents in the possession of IMC, as well as IMC's own conduct, positively refute fraud on the part of Dahlem. The defendant has completely failed to convince this court that it signed the contract under misrepresentations of material facts. Because of this, it is unnecessary to point out other discrepancies or conflicts in the testimony of IMC witnesses with respect to the location and type of clay that Dahlem allegedly represented concerning his secret deposit. Suffice it to say that Dahlem, although he was an uneducated and self-trained prospector, shrewdly knew how to play the mineral game; and he was able to match wits with but did not defraud the astute and skillful negotiators sent by IMC purposely to contract with him for information regarding bentonite deposits. We, therefore, reject the defense of fraud.

(b) *Failure of Consideration— "Known Only to Him."*

The second, and more serious, issue goes to the defense of utter failure of consideration. IMC's contention in this regard is that the existence of bentonite deposits on the lands referred to as the yellow area was already known to IMC, its competitors and the public generally prior to the execution of the royalty agreement, that Dahlem did not provide IMC with information that it did not already have, and he failed to disclose deposits "known only to him". The defendant asserts, therefore, since it received no consideration of value from Dahlem, the royalty agreement, being nudum pactum, is not legally enforceable. Dabbs vigorously disputes this contention, thus raising a clear-cut factual question to which most of the evidence is addressed.

Mississippi adheres to the generally recognized rule that a consideration, while essential to the formation of a valid agreement, need not be adequate to be sufficient in law, and a sufficient consideration for a promise exists if there be any benefit to the promisor or a detriment to the promisee.[17] Otherwise stated, the consideration for a promise is generally held to be sufficient where it is something of real value in the eyes of the law; and if it is so regarded, its adequacy is ordinarily immaterial, as its pecuniary or economic value.[18] Thus, courts, ordinarily in construing contracts made between adult persons suffering from no disabilities, will not inquire into the adequacy of consideration; and if a person chooses to make an extravagant promise for an inadequate consideration, it is entirely his own affair. "The legal sufficiency of a consideration for a promise does not depend upon the comparative economic value of the consideration and of what is promised in return." [19]

Although Mississippi has no factual precedent, we have no doubt that its courts would unhesitatingly follow the general rule concerning furnishing information, stated as follows:

"Although information may be a valuable consideration for a promise to pay for it, where information is proffered as the consideration for a contract it must be new or novel. Information known to everyone is not consideration. A statement to one of what he already knows is not, as to him, information, but a statement of a fact already known; and it cannot constitute consideration . . . " Am.Jur.2d, ibid, § 99, p. 444.[20]

The defendant incorrectly argues that the burden of proving the presence of valuable consideration rests upon Dabbs. The law is well settled that it is only where a contract is such that on its face no consideration is imported the party relying on the agreement must establish consideration as a basis for recovery. Where the contract, as here, facially imports a consideration, that is, a stated description of lands identified by Dahlem, the burden of establishing the failure of the recited consideration (new or novel information) falls upon IMC, who has asserted it as an affirmative defense in its answer. A defendant, merely by raising the issue, does not shift the burden of proof to the opposite party who relies upon the contract.[21] The logic of this rule is obvious here since in the absence of any evidence on the issue, IMC would necessarily fail, as the contract itself contains a recited consideration which would not have been undermined by proof. Necessarily this places the burden of proving want of consideration upon the defendant. Despite the foregoing rule, this court finds upon the whole proof that Dabbs has shown the existence of a sufficient consideration by a preponderance of the evidence. The case law, however, supports IMC's contention that failure of consideration, such as to invalidate an agreement, may be shown by parol, extrinsic evidence, dehors the writing.[22]

17. Miller v. Bank of Holly Springs, 131 Miss. 55, 95 So. 129 (1923); Council v. United States, 302 F.Supp. 1315 (N.D. Miss.1969).

18. 17 Am.Jur.2d, Contracts, § 95, p. 438. Accord, Ogle v. Durley, 223 Miss. 32, 77 So.2d 688 (1955); In re Sadler's Estate, 232 Miss. 349, 98 So.2d 863 (1957).

19. Am.Jur.2d, ibid. § 102, p. 445–446.

20. Other statements of the rule may be found in 17 C.J.S., Contracts, § 87, p. 772 (1963): " . . . giving information which is new or novel and valuable or thought to be so"; and 1 Williston on Contracts (3rd Ed.) § 115, p. 457: "However, an idea lacking novelty and originality and universally known, . . . will not readily be regarded as requested by a promisor as the consideration for his promise."

21. Rule 8(c), F.R.Civ.P. See authorities generally in 17A C.J.S. Contracts § 583, pp. 1120–1121.

22. Meyer v. Casey, 57 Miss. 615 (1880); Broome Construction Co. v. Beaver Lake

The royalty contract provides that Dahlem must disclose bentonite deposit "known only to him" and IMC, engaged in the business of purchasing and mining bentonite, was "interested in *learning the location of such bentonite deposit* with the view of purchasing or leasing same for mining purposes." The phrase "known only to him" does not appear to have been the subject of interpretation by any court in the nation, and helpful analogies in the law have neither been cited by counsel nor otherwise been brought to the attention of this court. As Loucks testified, the purpose of the phrase was to protect IMC from having to pay for information that it already knew; and it is this meaning which is conveyed by the words of the document. Otherwise stated, the phrase, "known only to him", meant that Dahlem had to supply information that was *unknown to IMC or the public generally*. IMC's bentonite knowledge, of course, rested upon its own prior exploratory programs and all information in the public domain, such as published geological studies of bentonite deposits in Monroe County. It is our view that if IMC did acquire bentonite information novel and unknown to it, thus satisfying what it expected to receive for its promise, it is of no consequence that Dahlem might have shared his secret with his wife, or his brother-in-law or other persons who kept his confidence. We reject a harsh, literal application of the words "known *only* to him" as requiring that the information to be not only unknown to IMC and the public generally but beyond the knowledge of any other person. By holding that the consideration was in furnishing bentonite information unknown to IMC or information not already accessible to it, this court accords to the written agreement a fair, reasonable, and proper interpretation, and one faithful to the express intent of the parties.

Laying aside the special knowledge, if any, that Dahlem may have possessed, the record is surely replete with evidence that the pre-contract knowledge of IMC, and its predecessor ECP, of bentonite in the Monroe-Itawamba Counties area, was extensive, and equalled, if it did not surpass, the accumulated knowledge of the field geologists, competing mining companies, affected landowners, and independent prospectors of bentonite. At the trial, IMC offered five geologists as expert witnesses, Dr. Hunter, Roy Hall, Jefferson Teague, Frederic F. Mellen and N. J. Dunbeck; it also introduced Phillips' correspondence. In addition, defendant offered pertinent published geological studies on Mississippi bentonite, particularly the deposits located in the Panther Creek area. Dabbs relied principally upon the testimony and written reports of Tracy Lusk, the testimony of certain lay witnesses, the in-court admissions made by defendant's geologists and what he contends to be the correct evaluation of the antecedent geological reports and studies.

After a careful and detailed study of the expert testimony, the geological maps, the reports and writings of the several geologists and other relevant data, the court concludes that neither IMC, the affected landowners nor the general public was aware of the precise location and size of the commercial bentonite deposits in the yellow area before Dahlem's disclosure. The information he supplied was of value to IMC and materially aided it in its search for new bentonite reserves. The court holds that the "geological deductions" by certain IMC expert witnesses that the Panther Creek deposit, since it was of marine rather than non-marine origin, had to be a continuous deposit of broad lateral extent—a fact allegedly known since 1940 when P & L began mining its bentonite outcrop—do not begin to answer the question. It is quite clear that, prior to Lusk's exploration, while other lands in the vicinity of the P & L mine, including the yellow area, were regarded by

Recreational Center, Inc., 229 So.2d 545 (Miss.1969). 30 Am.Jur.2d, Evidence, § 1033, p. 169: "Parol evidence is always competent to show the nonexistence of the contract."

IMC as prime prospective territory for wildcat drilling, no one in that company knew the size and extent of the Panther Creek formation, or if continuous, the precise route and depth of the bentonite strata.

In reaching this determination, the court is impressed with certain basic, undisputed physical facts; viz, (i) the bentonite deposits were located in terrain that is hilly, rugged, inaccessible and without interior roads; (ii) the deposits were buried from 50 to 120 feet below ground surface; (iii) there *were no outcroppings or exposed areas at any point*; and (iv) prior to Dahlem's contract there had been no known deep-hole drilling in the particular territory. Thus it was that each geological expert who testified acknowledged one might suspect but could not know if or where bentonite might be located thereon, except by drilling. IMC rated a tremendous mass of land—23 square miles—in the same category. Indeed, in the pre-1955 era, the presence of a known bentonite deposit on the P & L tract being mined did not indicate to geologists or to the mining industry the existence of large bentonite formations such as Lusk documented following the Dahlem contract. For example, to American Colloid personnel a bentonite bed of as much as 20 acres was a large deposit. The total drilling experience in Monroe County prior to 1955 had established that bentonite, like oil, was spotty, elusive, and usually found in pods or scattered occurrences which IMC carefully charted for guidance in future wildcat drilling.

Because of the importance of the issue, we shall briefly, if somewhat repetitively, examine in chronological order the significant features of various geological reports to show that they do not conflict with, but provide evidentiary support for, our holding that Dahlem did lead IMC to secret bentonite deposits. These reports, and the studies based thereon, were published and com-piled by numerous persons ranging over a 27-year period as follows:

(a) *Grim Report—1928.*

Ralph E. Grim, a geologist connected with the Mississippi Geological Survey, in 1928 prepared the first report making reference to Dahlem's initial 1927 discovery. Grim's report (Ex. 3, p. 2) had the following notation:

> *"Outcroppings* of the material can be found in the beds of Panther and Little Panther Creeks and their numerous tributaries about a mile west of the Tombigbee River, in parts of Sections *14, 23,* 26, Twp. 15S, R 7E." (Emphasis added).

Grim made visual inspection of outcrops but did no drilling, stating: "As the material is located in the creek bottoms and has not been ·dug into, it is very hard to get unweathered material for testing." (p. 6) By locating outcrops in parts of Sections 14 and 23, Grim was in obvious error; under uncontradicted proof there are no outcrops in Section 14 or 23.[23] The only detailed study offered by Grim was of the property owned by Dahlem in the Northeast Quarter of Section 26.

(b) *Bay Report—1935.*

In another early study for Mississippi State Geological Survey, Harry X. Bay (Ex. 163) expounded that there were two distinct beds present in the Panther and Little Panther Creek areas, five miles south of Aberdeen (upper and lower). These deposits were placed by Bay in Sections *24,* 25 and 26, yet he mislocated the property owned by N. W. Dahlem to be in Section 24, instead of in the Northeast Quarter of Section *26.* Since the only outcrops in Section 24 are located in the Northeast Quarter, it seems clear that Bay intended to include only that quarter section in describing the area of known deposit in Section 24. This report added little to Grim's previous findings.

---

23. This error of location is perpetuated by others, as will be hereinafter noted.

(c) *Poole Maynard Report—1935.*

As heretofore stated, Poole Maynard, a New York geologist hired by P&L, made a detailed study of the properties under the control of P&L. This he did in 1935, pointing out in his report: "I beg to submit the results of my investigation of the bentonite properties *under your ownership and control* in Monroe County, Miss."[24] Maynard, who prospected by means of a 4″ hand auger and by sinking of shafts, reported: "The bentonite bed gradually rises about twenty feet to the mile going *east* as Panther Creek cuts its way down, flowing east to the Tombigbee River . . . It was revealed in prospecting that the bed (strata) of bentonite is continuous, so that without fail it was always possible to cross cut the bentonite by means of auger (drill) or shaft. On account of the continuity of the deposit, the outer line of the *known commercial bentonite* was placed at a series of points 150 feet from the outer edge of auger (drill) holes and shafts . . . The general strike of the bentonite bed is North and South and the bed of bentonite dips to the West from twenty to thirty feet to the mile." (Emphasis added).[25] The properties drilled by Maynard were located south and east of the yellow area; his program called for shallow-hole drilling and only a few holes were drilled in excess of 20 feet. This geologist estimated known reserves of 548,172 tons on the P&L properties, made up of 190,772 tons of yellow bentonite for strip mining and 357,400 tons of blue bentonite for underground mining. While this report furnished a significant advance over the prior general findings, yet Maynard's drilling was restricted to locations on P&L properties which were characterized by outcrops and a shallow strata of bentonite.

(d) *Vestal Reports (2).*

(1) 1936. Another State geologist, Franklin E. Vestal, next discussed the four known localities of bentonite in Monroe County, stating one of them to be:

"A body of bentonite *exposed* by Panther and Little Panther Creeks . . . a mile west of the [Tombigbee] River and four to six miles south of Aberdeen . . . It underlies parts of Secs. *14, 23,* 24, 25 and 26, T. 15 S., R. 7 E., and properties of N. W. Dahlem, Fred Dahlem, Bank, Johnson, Sykes and possibly others . . ." (Emphasis added). (Ex. 164, p. 28).

Although relying upon the Poole Maynard report. Vestal, like Grim and Bay, incorrectly located some of exposed outcroppings which did not exist in Sections 14, 23, or in the Northwest Quarter of 24. The samples which Vestal used to determine bleach ratings came only from Dahlem's land (p. 39). This report contributed nothing to the known geology.

(2) 1943. Vestal's second inspection of the Panther Creek area again erroneously listed land Sections *14* and *23* in the region of known deposits. The property owners identified did not include any landowners within the yellow area. Vestal did not indicate that he did any drilling or take any samples from that area. This second field trip unearthed no new information relevant to our inquiry.

(e) *Mellen Reports (3).*

(1) 1937. That year Frederic F. Mellen, a geologist, made a field trip to the 1927 Dahlem discovery, reporting: "I prospected the area somewhat more in detail then previously but found no further extension, although conditions indicate that wide prospecting might reveal a large continuation." (Ex. 174). Mel-

---

24. Ex. 69. The P&L bentonite properties consisting of 960 acres were established as Needham Dahlem's own property (NE¼ § 26), P&L tract (N½ § 25), Banks property (SW¼ § 24),

Johnson property (NE¼ § 24), and Sykes property (SE¼ § 24).

25. Ex. 69, pp. 9, 13, 15, 16, 19.

len prospected *south* of the P&L property, located a bentonite bed near the juncture of the Tombigbee River and Buttahatchie Creek, and reported: "This bed [which is at least five miles south of the Dahlem bentonite] is probably, then, a southward continuation of the Dahlem bentonite. It extends in rather uniform thickness for a mile or more north-south in sections 25, & 26, T. 21 N, R. 7 E., Clay County, Mississippi." This exploration was clearly limited to lands lying considerably south of the original P&L mine.

(2) 1942. On his second trip to the Panther Creek area, Mellen did drill on land near the yellow area, i. e., on the Bradley-Kilgo-Sally Johnson properties which he described as the Southeast Quarter of Section 13 and the Northeast Quarter of Section 24. Mellen's test hole records fully support this finding.[26] These lands are northeast of the P&L mine; they contain outcroppings and lie due east of the yellow area.

(3) 1952. On this third visit in 1952, Mellen made a detailed study of the P&L properties, advising ECP that he was of the opinion that the "properties studied and adjoining lands merit the serious attention of your company." (Ex. 178). It should be stressed that Mellen confined his work to the property controlled by P&L but did not drill thereon. His study consisted of two phases: "(1) the securing of the P&L map and report of Poole Maynard and study of the report and map in the office; and (2) the examination of the mined-out areas and inspection of the remaining reserves as indicated by a relatively few outcrops and general use of Maynard's map in the field." Mellen's

report was in essence an evaluation of the original Dahlem discovery in case ECP should consider purchasing it in the future. He did recommend, however, exploratory drilling.[27] This was the first direct suggestion that IMC might undertake exploratory drilling operations on the P&L property and adjoining lands. Mellen took Maynard's estimated reserves, used Maynard's study and drilling data, and did not attempt to calculate new reserve information for IMC. The tenor of this report was Mellen's belief that P&L property might be more efficiently mined than it had been under American Colloid should exploratory operations on the eastern bluff of the area near the Tombigbee River reveal a continuation of the bentonite deposit.

(f) *Stephenson-Moore report—1940.*

This study (Ex. 191) largely referred to other geological reports and furnished no new data.

(g) *Phillips' correspondence—1939-42.*

E. D. Phillips, the practical prospector mentioned earlier (ante p. 7), advised Dunbeck of his wide-ranging activity in ferreting out tips, rumors and all sorts of reports on minerals. Although his prolific letters (Exs. 71–158) are not easy to place in proper focus, it is clear that his shallow-hole drilling and examination of outcrops did not extend to any land in the yellow area. His findings related to certain property to the north (Alice Strong acreage in § 12), to the east (Bradley tract in § 13), and immediately south of the Bradley tract (Johnson property, NE ¼ § 24). He estimated only small tonnages, i. e., Strong 15,000 tons, Bradley 30,000 tons and

---

26. Exs. 180, 258.

27. Mellen wrote: "In order to evaluate the property fully a prospecting program of a number of months should be inaugurated. This should involve deeper drilling on the ridges, starting on the easternmost limits of the deposit and working westward. The ridges to the North of Panther Creek should be worked before those on the South, since the slopes are

less steep and greater quantities of clay can be removed with less overburden. Power drilling would be almost a necessity because many holes 50 to 130 feet in depth would be required. Should these holes confirm a great quantity of clay as indicated by the shallow holes drilled by Maynard, it is felt that the topographic mapping referred to above should be done, and the locations of the holes tied into the topographic map." (Ex. 178, p. 4).

Johnson 50,000 tons, but made no estimates of other property under P&L's control.[28] Note should be taken of Phillips' confusing reference to the Cole property.[29] In one letter (Ex. 110) Phillips wrote that he loaned Cole a drill, that Cole found bentonite on his property (of unidentified location), and that Cole would show the clay to Phillips the following week. Phillips never mentioned this again, and the court can give no credence to such hearsay, although it might possibly be that this was the L. B. Cole property located in Sections 14 and 23 (within the yellow area) that IMC is presently mining.

(h) *Hunter-Hall report—1954.*

As heretofore stated, IMC's geologists, Frank Hunter and Roy Hall, in 1954 did extensive drilling in the Smithville vicinity in Itawamba and Monroe Counties, which was far distant from the yellow area. At the conclusion of their work, they designated the four broad areas for IMC's future wildcat drilling. While neither Hunter nor Hall drilled in Area IV, they had available all pertinent geological literature then published by state and federal agencies, as well as the Mellen and Poole Maynard reports. In their summary, these geologists made the following comment regarding Area IV, which was rated lowest in order of priority:

"Area IV was selected because of numerous bentonite deposits reported in the area. *Very little is known about the geology of this area* and one week of surface geology prior to exploratory drilling would be desirable. If reports are correct, Area IV is a very good prospect although it is farthest from the [Smithville] plant." (Emphasis added) (Ex. 70, p. 27).

The court notes that these geologists compiled all known information on their geologic map (Footnote 4), showing the specific locations of the occurrences of bentonite deposits in Monroe and Itawamba Counties.[30] It is significant that, despite Mellen's 1952 recommendation, these geologists gave Area IV the lowest priority, but ironically the Hunter-Hall report emphasized the desirability of getting information from Dahlem on his secret deposits, specifically recommending the negotiation of a contract to pay a royalty for the disclosure.

(i) *Lusk's weekly reports—1955.*

Lusk's work was a continuation of the Hunter-Hall study which began in the Smithville area. Under Hunter's direction, Lusk had three objectives in mind: (1) to estimate reserves then under the control of IMC; (2) to ascertain competitors' reserves; and (3) to locate new and unknown reserves. After leaving Smithville he was directed to drill the perimeter of the property under P&L control. When Dahlem approached him with an offer of secret information, IMC had no planned drilling program for the land in the yellow area, nor had any drilling work actually been done by IMC in Area IV. While Lusk regarded all property near the P&L mine as prime prospective territory and had access to the Maynard, Mellen and other geological reports, Lusk, as he later testified, did not know the nature and extent of the huge bentonite deposits in the yellow area until his attention was

---

28. Exs. 85, 94, 124, 146 and 147. Compare Lusk's estimate of the Bradley 80 in the yellow area (1,450,000 tons, Ex. 67, p. 7) with the 30,000 tons Phillips estimated on a Bradley tract.

29. The parties stipulate that during the period of time under review there were two different Coles, that they owned various lands not only in the Smithville area but north and south of Aberdeen, both within and outside the confines of the yellow area.

30. These occurrences are indicated by black spots on the map which show as to Area IV only the following deposits: the Alice Strong deposit in the northeast corner, the Duke, Hogan, Keeton and Watson deposits on the south end, and the original Dahlem discovery on the Dahlem, P&L and American Colloid properties in the center. These geologists made no indication of known occurrences on any of the property located within the yellow area.

drawn to that particular territory by Dahlem's furnishing the land description, showing the pits and deep holes drilled by Dahlem, and supplying samples of the Tombigbee clay. Lusk's reports submitted at the time support this finding, and they also confirm that IMC's subsequent drilling program was geared to Dahlem's information and the company's ability to gain control of the lands by options or mining rights.

 This court is impressed with the testimony of Tracy Lusk, who after studying his 1955 weekly reports and other pertinent data, stated that Dahlem's information was of material aid to IMC's carrying out a successful exploratory program on an accelerated basis; that before such information "we didn't know for a fact the location or extent of the deposit", although without it IMC would have drilled at some point in time since "it was a target area and near the P&L mine." Lusk emphasized that no one other than Dahlem gave him any information about the location of deposits in the yellow area, and he did not consider IMC's prior information available to him as sufficient to put him on notice that there were in fact commercial bentonite deposits in the yellow area. The timing of the information, of course, enabled IMC to make advantageous approaches to the landowners who were unaware of the deposits beneath their lands and to move ahead of its competition operating in the vicinity. Lusk expressed surprise at the failure of American Colloid to find and tie up the deposit before IMC did. Lusk's statements are fully supported by the record, thus enabling this court to find, in accordance with the probabilities, that the information which Dahlem supplied to IMC was new or novel to it and furnished IMC with valuable unknown facts about bentonite.

Since the record supports the foregoing conclusion, this court must reject the testimony of Maurice Clay that when he first saw the land description that Dahlem furnished he told Dahlem that IMC already knew about those lands and there was nothing secret about the information. Indeed, IMC's own records adequately refute this testimony; neither do those records support the post-1955 views of other IMC officials that they knew of this location of commercial bentonite deposits.

IMC, therefore, has failed to establish failure of consideration as a defense. Indeed, the whole record plainly discloses that something which the law regards of value, i. e., new or novel information, was furnished by Dahlem to support the promise of IMC. From a lengthy record this key fact has emerged, unobscured by either the sealing of Dahlem's lips by death or the passage of fifteen years from the making of the contract until IMC's challenge.

For the foregoing reasons the court declares the royalty contract in suit is legal, valid, and enforceable in accordance with its terms.

Judgment for plaintiff shall be entered accordingly.